Hear ye, hear ye, hear ye. The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States and his Honorable Court. Thank you, Kim. We call the next case, number 20-20471, United States of America and Federal Republic of Nigeria v. Galactica Star et al. Counsel, thank you for appearing with us via video argument. We look forward to your arguments today. We have four counsel who will be presenting arguments, and we will start with Mr. Al-Madani for LightRay Captl. Are you ready, sir? Yes, Your Honor. Good morning, Your Honors. May it please the Court, Yassin Al-Madani appearing for appellant LightRay. And Your Honors, all we're asking for here is the due process that Congress intended in civil forfeiture. And in terms of Article 3, I think the circuit courts that have examined the issue have clearly come out that even a shareholder has an equitable interest in property. And so Article 3 standing is certainly not the issue that we're discussing here because Article 3 standing is there. We have injury. In fact, it's fairly traceable to the United States actions, and it's likely to be redressed by a favorable. Mr. Al-Madani, the first obstacle you have is to deal with the district court's denial of your attempt to get out of stipulation. Talk to us a little bit about that. In terms of the stipulation, Your Honor, that has only to do with the Galactica Star proceeds, not the other property that's at issue here. And in terms of the Galactica Star proceeds, Your Honor, all my argument there is that when I came into the case, I was the third counsel to come into the case. When I came into the case, the government had filed a motion to strike Light Ray. The previous counsel had not filed claims on behalf of the subsidiaries of the holding companies that Light Ray had acquired that held the assets. And so when I came into the case, I was dealing with the motion to strike. The court granted the motion to strike. We were out of the case. Then the court, because of the stay that the court had ordered in terms of the rest of the case, decided that it was going to hold off and decide whether the subsidiaries were going to be allowed into the case or not until the stay was lifted. So we really didn't have any procedural vehicle to challenge or make a record on what we're claiming was the government gaming the system to get the stipulation on the Galactica Star proceeds. And that is only with respect to the Galactica Star because there are a number of other assets that are at issue here that really go to the prudential standing issue that's the predominant issue on this appeal. But I hope that answers the court's question on duress. We just haven't had a chance to make our record because of where the case is procedurally. So what do you say? I mean, you're not claiming proceeds of the Galactica Star? We are claiming proceeds of the Galactica Star, but we would have to go back. The district court would have to allow us to take some discovery for the United States to take discovery on the issue of whether the government did game the system here in order to get the stipulation from us. But the record has to be developed there. So all we're asking for there is for us to be able to make the motion that this stipulation was not fair. The way that the government got the stipulation was not fair. That's all we're asking for. The district court had a hearing. Did you try to put on a case at the hearing? The district court had a hearing, Your Honor, to forfeit the proceeds, but we couldn't put on a case because we were not procedurally in the case. Light Ray had been struck, so we couldn't do anything on behalf of Light Ray. And the district court had said that it was going to hold its decision on whether the subsidiaries were going to be let into the case. So we weren't in the case. That's the problem. So there wasn't a way there wasn't a vehicle for us. So all I was able to do is appear orally and and plead to the court that can you please hold off on making this decision until you decide on our motions until we have some decision on the appeal in terms of whether Light Ray would be allowed in the case, then we could make our record. On that issue, Your Honor, we just haven't even been able to make the record. We haven't been able to make the argument. We haven't had an opportunity because we haven't been in the case. The court has barred us from the case so far. You withdrew. You filed a stipulation that you withdrew. That's the reason you're not in the case. No, Your Honor. The reason we're not in the case is because the district court struck Light Ray from the case on the standing issue. We only withdrew. You already withdrew. So that's the first thing you did. You joined that stipulation. But the stipulation only concerns the Galactica Star proceeds, Your Honor, not the rest. That's what we're dealing with today. We're actually dealing, Your Honor, with a number of assets, not just the Galactica Star proceeds. So we're dealing with the Galactica Star proceeds. We're dealing with proceeds in terms of real property, monies received from the sales of real properties. We're dealing with a promissory note. So we're dealing with a number of different assets, Your Honor. And the only thing that Light Ray withdrew its claim on was the Galactica Star proceeds. We didn't withdraw from the case. We were struck from the case on the standing issue. Counsel, let me ask you this, and Judge Davis can follow up on that. I just want to get one question out. With respect to the other proceeds, forget the Galactica Star, if this court decided that you lack prudential standing because you are essentially claiming an interest in the property as shareholders of the Earnshaw Corporation, if we decided under a case like Wiley that you had no interest and therefore you lack prudential standing, would then, in your view, I know you disagree with that, but if we decided that, does the stipulation issue that you've just been talking to with Judge Davis go away? Yeah, then it goes away, Your Honor. That's exactly it. Because the fundamental issue is whether Light Ray has prudential standing under the forfeiture statute. And I can speak to that if the court would like me to distinguish Wiley. I was just trying to understand the order of precedence in our decisions. And I mean, Judge Davis makes a number of points about the stipulation that I think are very fair. But we also have this prudential standing issue where I think you're vulnerable under the Wiley case. So why don't you go ahead and distinguish it? Yes, Your Honor. So under the Wiley case, the Wiley case was decided under the criminal forfeiture statute 853 N. And the criminal forfeiture statute for a party to have prudential standing there requires, and I quote the statute, a legal interest. Whereas in the civil forfeiture statute, Congress has expanded prudential standing to the maximum allowable by law. So this court's precedent in Porsche Carrera is on point where any culpable interest suffices. And so in terms of this, you know, I point the court to an example that really resonates with me. If you borrow a car from your friend or if I borrowed a car from my friend and I was driving, I was at a red light. I got rear ended and there was property damage to the car. I would be able to sue for personal injury, but the property damage to the car, because it wasn't my car, I wouldn't be able to sue for. I wouldn't have standing. And that's clear. Everybody would agree on that. But in that same scenario, if I had borrowed that car and I was stopped by officers who seized the car and wanted to forfeit it, I could, as a possessor of the car, file a claim, which tells us that prudential standing has been expanded to the maximum allowable. And under Supreme Court precedent, the Gladstone case, Congress can do that. The best case for the proposition that the corporate shareholders have standing prudential standing, either one to to contest the forfeiture with respect to the underlying corporate property. That would be eleven million dollars, Your Honor. Eleven million. That's the Eighth Circuit case. But eleven million. There is an issue with eleven million because when eleven million went on to consider innocent ownership, I think the court didn't grapple with the question that or with the issue that we've raised here, which is and we've cited this legislative history. Your Honor, that and I and I quote the term owner should be broadly interpreted to include any person with a recognizable legal or equitable interest in the property. So when you're looking at the innocent owner defense, we have to look at this quote from Congress that's also been cited in the case law. That's the funds held in the name for the benefit of wetter. That case, it's 210 F. Third. Ninety six. So we have to look at what congressional intent was and what sort of broad prudential standing Congress was granting in the forfeiture scheme. And when you also look at the Black's Law Dictionary, equitable ownership is defined as corporate shareholders power to buy or sell shares. And so we have an equitable interest. Nobody disagrees with that. Even Wiley says that the shareholders bottom their standing on their claim to an equitable interest in corporate assets. Wiley recognized that there was an equitable interest. But Wiley said, you know, in the in the criminal forfeiture statute, you really need a legal interest, which is right in that scheme. Thank you, Counsel. You'll have time for rebuttal. Next up, Mr Barrett for Enron Nigeria Power Holding. Good morning, Your Honors. May it please the court. My name is Kenneth Barrett, and I represent Enron Nigeria Power Holding Limited, and we have sought and are seeking the court's help in enforcing a judgment against the Federal Republic of Nigeria. We believe there are four critical issues to this appeal. The first, all of which relate to 1610A of the Foreign Sovereign Immunities Act, which provides that the property of a foreign sovereign in the United States is subject to execution if that property is used in a commercial activity. Now, those four issues are, the first one relates to the eligibility of the asset that we have sought to turnover for, whether it is eligible under the Foreign Sovereign Immunities Act and the Texas Business and Commerce Code for turnover. We believe the answer is yes. And the second issue pertains to the Europa case, which is a state appellate court decision which lays out the grounds that a turnover applicant has to lay out. The issue is whether under that authority, which seems to be the predominant authority in the state of Texas on that issue, whether if those grounds are satisfied and the judgment debtor does not provide evidence contradicting those grounds, whether the judgment creditor is entitled to turnover. The third issue relates to whether a party in Nigeria's position can intervene in a in-rim proceeding under the supplemental rules and under the Texas Rules of Civil Procedure, specifically not the Texas Rules of Civil Procedure, but the Federal Rules of Civil Procedure, particularly Rule 24 of the Federal Rules of Civil Procedure, which allows intervention. And the last issue is what happens in a situation in which a judgment creditor has intervened in an in-rim proceeding and has staked claim to an asset, which in this case is a verified claim, which the judgment debtor then attempts to get rid of without prejudice with the approval of the court. Is it permissible for a court to do that under the common law principles of equity and the rules governing these proceedings, whether a court may do that? Am I right? Is the threshold issue here whether there is commercial activity such that you get through the FSIA? Yes. Okay, so why don't you address that first? Because since that's a threshold issue, you know, we have to address that. Right. It is our position that the law as set forth in the Weltover case, that Justice Scalia's opinion, unanimous opinion in the Supreme Court, this court's opinion in the Walter Fuller aircraft versus the Philippines case, as well as the plain language of 1610 and 1603 set forth the guidelines. In a nutshell, those decisions and that statute all indicate that the court's inquiry about commercial activity has to be about the nature of the activity. And in this situation, the nature of the activity was a sale of a luxury consumer product. The Nigeria participated in that sale or admitted that it was to participate in that sale in its joint motion for the sale of the item in which it set out exactly what its authority was. Set the price, identify the auctioneer, set the length of the auction term. All of those things, all of those things are hallmarks of a commercial activity. It's a sale. The Walter Fuller case involved facts similar to this case, somewhat similar, in which the Republic of the Philippines and its instrumentality were charged with going after the assets that the Marcoses had stolen from the country. And they had seized an aircraft and then had sold it to Walter Fuller aircraft and in that agreement had agreed to indemnify Walter Fuller in the event that Walter Fuller sold it to somebody else. The court looked at that set of facts and said that the contract for sale, the involvement in the sale, was commercial activity. And despite the purpose of the sale, which may have been to replenish the reserves of the country, the nature of the activity was commercial and dictated the result that the court found that to be commercial activity. We believe that that finding is binding on this court and persuades it because it follows Weltover and it mimics the plain language of 1610 and 1603. What you actually seized was Nigerian plain in the civil proceeding here. You didn't seize the vessel. That's correct. So even if they did use the vessel, that wouldn't get you all the way home, would it? If they just used the vessel, if I understand your question, if Nigeria just used the vessel itself, that would not put Nigeria's claim in the path of execution. What Enron Nigeria Power Holdings is seeking is attachment of the claim because the claim was used to enable Nigeria to participate in the sale. We're not all the way home in terms of collecting on the judgment, but if we're in the shoes of Nigeria trying to assert its claim, then it's possible that Enron Nigeria may recover some assets that could satisfy the judgment. But this would just be the first step in that process of trying to satisfy the judgment. And so you're missing that in the Philippines case, this middle step is missing, right? In the Philippines case, there's no doubt about who owns the aircraft and where the proceeds of the sale go. Whereas in this case, it strikes me that the government is the US government is the one that's actually selling the boat. They're the ones that orchestrate the sale. In Nigeria, the only right they have to participate is obviously the verified claim that you're seeking to attach. But it's a level of attenuation that's missing, for example, in the case of the Marcos. That's correct. The facts are slightly different. But the issue still remains as to whether or not Nigeria's actions constitute commercial activity. It's our position that it does. The issue is to answer eligibility includes whether it's a commercial activity, but also whether a claim in and of itself is something that can be executed upon by a judgment creditor. And it's clear under Texas authority that cited in the brief that legal claims can be seized. The next issue I'll talk about is the issue of whether or not a party in our position can intervene in an action. And according to Rule 24 of the Federal Rules of Civil Procedure, a party can do that if they have an interest related to a property that is in a that is the subject of a lawsuit. This court recognized in the USA versus four point four million four point four eight million dollar case. I think it's an opinion that Judge Duncan authored that an intervener has rights that are equal to the rights of the other parties in the case. It's our position that given the intervention into the case that as a matter of equity and fairness, the my client should have been allowed to object to the dismissal of the case. But that aside, in effect or theoretically, the claim still exists because in the notice of dismissal, it was including in the motion for joint consent. There was no mention that that claim was being dismissed with prejudice. And so in the absence of that under Rule 41, the the claim theoretically still exists and could be subject to turnover. And we're urging the court to take that into consideration. The. Let's see what left the. The other issue pertains to the Europa case, which we believe is controlling president in the state of Texas. We've seen no indication that the state's Texas Supreme Court would reject the finding in that case that once a judgment creditor establishes the grounds for turnover, the burden shifts to the judgment debtor to disprove those elements. The Nigeria has is not done. So it is not recanted. What was in the motion for joint sale in which it's its activities were described with regard to the sale of the boat. And so based on the Europa opinion, there was nothing to contradict the issue that number one, the asset there. There was a judgment debt. The asset was difficult to recover. And number three, that the the asset, the claim itself was something that was owned by Nigeria. In the absence of that, based on the Europa opinion in Nigeria, powerholdings was entitled to a turnover order. Thank you. You'll have a little time for rebuttal. Great. We'll move on to the United States, Mr. Son or son. May it please the court, Joshua Stone, the United States to address the light race standing issues first. Light Ray is trying to selectively disregard and uphold the corporate separateness whenever it suits them for purposes of innocent ownership. Light race says that corporate separateness must be honored, that an Earnshaw's guilty knowledge should be firewalled at the subsidiary level. And that light ray did not acquire Earnshaw's guilty knowledge when it acquired Earnshaw's stock. But then for purposes of standing, light ray seeks to disregard corporate separateness, pierce its own corporate veil and claim for itself an interest in Earnshaw's assets. And the law does not allow light rate to do this. Indeed, the civil forfeiture statute and rules limit standing to persons with a, quote, interest in the dependent property. That word shows up in supplemental rule G5A1, as well as 18 U.S.C. 983A2C. So there is no dispute that for light ray to have standing, it would need to have an interest in the dependent property. But as this court held in Wiley, shareholders, quote, have no interest, end quote, in corporate assets subject to forfeiture. That's at page 304 of the Wiley case, 193 F3D at 304. What do you make of Mr. Almadani's distinction between legal interest in that statute and the interest, the equitable interest that he's asserting here? So that distinction fails for at least two reasons. And let me address them in turn. First, the Wiley shareholders, as I believe Mr. Almadani admitted, they tried to claim, quote, an equitable interest in the subject assets. But this court said, no, no, no, you have no interest. So under Wiley, the distinction between equitable interest and legal interest is unavailing. Shareholders have, quote, no interest. And secondly, we cite unroboted case law, unroboted, Your Honor, showing that the that the criminal forfeiture statute grants standing to those with both legal and equitable interest. That's at page 19 of our brief. We cite the Wheaton case from the District of Maine, which in turn cites a number of other cases, as well as the TDC case from the D.C. Circuit, which says that we, in conformance with other circuits, conclude that the criminal forfeiture statute did not mean to draw that ancient distinction between interest in law and interest in equity, that when it talked about legal interest, it meant an interest under the law broadly defined, whether it sounds in law or whether it sounds in equity. So therefore, because the same type of interests, legal or equitable, would support standing for both civil and criminal forfeiture. Wiley's holding that shareholders lack standing must apply equally to civil and criminal forfeiture because of the same. I'm sorry. Oh, I'm sorry, Your Honor. Just to finish the thought, because, again, the same types of interest would support standing under the statute under the unroboted case law. Perfect. I'm sorry to cut you off. I was I thought you were finished. But we have a long line of cases that say Congress presumably uses the same language and have the same effect when they use the same words. And when they use different words, they presume them to be different. And so I'm curious how we could read the two statutes to take your second point first to have the same effect since they have a clear textual distinction. Well, first, because certainly, well, that rule is a well-recognized canon. It's not an inflexible canon. If there was any disagreement in the case law, I think that argument might get some traction. There is not. The case law is unanimous that the criminal forfeiture statute grants standing to both legal and equitable interest. And that makes sense because the term legal interest can mean different things. It can mean an interest recognized under the law, broadly defined, or it could seek to vindicate the pre-1934 distinction between law and equity. And there's no indication that I've seen in anyone's briefing that it intended to resuscitate that pre-1934 law equity distinction. So therefore, as every court has held when they said legal interest, they just mean an interest recognized under the law, broadly defined, whether it sounds in the ancient meaning of law or whether it sounds in the ancient meaning of equity. And I'm sorry, but even leaving aside Wiley, and we do think Wiley is dispositive for the reasons I just stated, even leaving aside Wiley, Lightray's argument that shareholders have a, quote, interest in forfeitable corporate assets would still fail because a civil forfeiture case doesn't seek to forfeit assets in the abstract. It seeks to forfeit specific corporate assets. And we cite unrebutted case law that shareholders do not have an asset, an interest in specific corporate assets. That's at page 20 of our red brief. We sent cases from this circuit and other circuits that whatever undifferentiated equitable interest shareholders may have in the corporation as a whole, they do not have an interest of any sort in any specific corporate assets. Counsel, can I, I want to back up just a little bit, and I want to try to get at this from a slightly different angle. If you if you'll humor the line of question, I understand the position of the United States. As you do not dispute that Lightray has an Article three injury, in fact, the way that we would typically consider constitutional standing. So under the Ensley case from this circuit, the bar against shareholder standing sounds in statutory or prudential terms rather than Article three terms. So under this circuit's precedent, there is certainly at least a strong argument that the bar here is a prudential or statutory bar. Other cases, just to be complete, just to be complete. Other cases have mostly found that the standing defect for shareholders sounds in Article three terms. But I would concede that under this circuit's precedent, there is a strong argument that the bar sounds in prudential or statutory terms. OK, great. So we can start with the Article three injury, in fact, requirement met. So then we turn to the statutory requirements that we've that we've been talking about. And I'm looking at the text of ninety three, a four. And I'm I'm curious, what would you point to in the text of this statute that would lead our court to conclude that the statutory requirements for an interest is one scintilla short of the Article three maximum that Congress could have authorized? Well, so I think the term interest has a meaning under the law. Both the statute and the rules say you must have an interest in the property. That's a term of art. Can the case law unanimously holds from this circuit and other circuits that shareholders have no interest? So in other words, your honor, you can imagine situations in which a party could suffer in Article three injury, in fact, from certain things. But nonetheless, they they lack a cognizable interest. I mean, just to use an example off the cuff, a spouse's property gets taken. That very well that very well may injure the person's spouse, the person's children, the person's relatives. It could have any number of ripple effects that could cause, quote, injury in fact. But the question is, do those people have a legally recognized interest in that asset? And that's the thing I'm getting hung up on is because. So Congress, you would agree with me, I'm sure that Congress can authorize and make actionable any sort of injury that consistent with the Article three minimum required by the injury in fact requirement. And so if Congress decides that we want to make any interest, not just those that would be legally actionable, for example, under state law, but any interest up to the article, the maximum actionable under 983 A4A, they certainly could do that. It's a strike. It strikes me that your argument is that, well, they didn't in fact do that. They stopped somewhere short of where Article three would have allowed Congress to write the statute, but they didn't have any qualification on the word interest. So I would say this, Your Honor, given the bedrock principle of American jurisprudence, that a shareholder is separate from the corporation, that injuries to the corporation must be vindicated by the corporation. I mean, you know, in the Dole to Patrickson case and plenty of Supreme Court cases saying this is a fundamental principle of American corporate law. At minimum, I think we would need some clear statement, either in the text of the civil forfeiture statute or at minimum, Your Honor, in the legislative history, saying we intend to disregard that bedrock principle and grant shareholder standing. And I haven't seen anything of that. So, again, Congress legislates against the backdrop of the common law, and it's hard to imagine a more venerable and bedrock principle of common law than the principle of corporate separateness. So absent any legislative statement that that principle intended to be dispensed with, we believe Congress meant to incorporate those bedrock corporate law principles into its meaning of who can sue in a civil forfeiture case. The only other thing I would add on the standing – actually, I would add two brief points on the standing issue. First, there is no limiting principle to Lightray's position because for two of the assets at issue here, the Montecito estate and the Fifth Avenue duplex, Lightray is merely the shareholder of a minority shareholder of another company that owns the assets. Earnshaw owns only 49 percent of the subsidiary holding companies that own those assets. So unless Lightray is going to abandon its claim on those two assets, there is no limiting principle to Lightray's position. If indirect minority shareholders have standing, then any shareholder has standing. A GM shareholder would have standing to challenge civil forfeiture of not only any GM property but even any property owned by any GM subsidiary. So the fact that Lightray seeks standing based on its status as an alleged indirect minority shareholder means that ruling for Lightray would really blow the door open to basically saying any shareholder can assert a claim anytime any corporation's assets are being taken, and there is zero support in the law for that proposition. The other point I would mention is that Lightray really bottoms most of its argument on its innocent owner positions, that it's an innocent owner, and that's why it's in the case. In fact, I don't want to go much beyond the record, but in the prior appeal, in oral argument, Lightray conceded that its entire case was based on innocent ownership, and that was the only reason it was in this case to begin with. Well, then let's go to the text of the Innocent Ownership Statute. That's section 983d6, which expressly says that innocent owners must possess, quote, an ownership interest in the specific property sought to be forfeited. So that says in explicit statutory terms what we believe the term interest means to vindicate in other parts of the statute, but here it's written into the Innocent Ownership Statute. And it goes on to say that this interest that would be sufficient for innocent ownership expressly does not include, quote, a person with only a general unsecured interest in or claim against the property or estate of another. Here, even assuming for the sake of argument that shareholders had some undifferentiated, inchoate interest in the corporation as a whole, the statute said that is not enough for innocent ownership. Someone with a general unsecured interest in the property or estate of another is what is expressly not sufficient for innocent ownership. So under the clear text of the statute, Light Ray cannot assert an innocent owner defense, and yet that is the whole reason they say they're in this case to begin with. To turn to the forfeiture of the Galactica Star proceeds, obviously at the time the district court forfeited the Galactica Star proceeds in May of 2020, Light Ray had been struck. So as Judge Duncan pointed out, if this court affirmed that standing decision, then clearly Light Ray's due process rights were not violated by forfeiture of the proceeds. And Earnshaw's rights weren't violated either because Earnshaw never made any claim on the proceeds, even as it made conditional claims on other assets. As we mentioned in our brief, the procedural posture is somewhat interesting here. When Light Ray's standing was hanging in the balance, Light Ray tendered proposed backup claims by its subsidiary saying, hey, if we're struck, at least let our subsidiaries file claims. And it tendered those proposed backup claims. Those proposed backup claims did not include a claim by Earnshaw on the Galactica. Earnshaw filed a claim on another asset, a promissory note. It did not file a claim on the Galactica. So forfeiture of the Galactica Star proceeds clearly would not violate Earnshaw's due process rights either because Earnshaw never even attempted to file a claim on that asset, even as it filed claims on other assets. Even leaving aside this point, Light Ray and Earnshaw were obviously aware of the forfeiture motion. They knew how to respond. They showed up at the hearing to make a oral response, but they elected to not even file an opposition brief. Everything that Mr. Almadani said in the forfeiture hearing for why forfeiture should be delayed or forestalled, he could have put that in a brief, and he elected not to do so. So just sort of as a basic procedural matter, clearly the case law holds when you're faced with an adverse motion and you don't even file an opposition brief, that is a waiver of any objection. You can't then show up at the hearing and say things you should have said in your brief. So for that reason as well, they have no real argument against forfeiture of the yacht proceeds. And even leaving aside that point, as Judge Davis pointed out, there was a stipulation by which they abandoned any claim to the yacht proceeds. So at minimum, they can't get off the ground with this argument unless they could overcome the stipulation, and they can't do so for both procedural and substantive reasons. Procedurally, of course, the district court held that they waived any challenge to the stipulation by not bringing it in the two years since the stipulation was struck. Now, Light Ray says it was out of the case for part of that time. There's a big problem with that. First, Light Ray was in the case for the almost six months between when the stipulation was signed in May of 2018 and when Light Ray was struck in October 2018. And during that entire time, we didn't hear a peep from Light Ray about them seeking to undo the stipulation. So there's significant lassitude even before Light Ray was struck. And then even afterwards, as I alluded to above earlier, they could have filed an opposition brief to the forfeiture motion saying, wait, wait, we need to delay forfeiture because we intend to challenge the stipulation. But they didn't, Your Honor. They didn't file any opposition brief to the forfeiture motion at all. Substantively, I made a bunch of arguments in the brief for why substantively they have no attack on the stipulation. I would just like to focus on one of those for the interest of brevity, which is that as far as we can tell, Light Ray's entire substantive argument for getting around the stipulation is that it was signed under duress because the magistrate judge's protective order over the yacht left Light Ray with no choice but to sign the stipulation. But they didn't appeal the magistrate judge's protective order. After it was issued, no one took an appeal of that order to the district court as they could have done. Under Rule 72A, that means they have waived any challenge to the magistrate judge's protective order. So they are now barred from collaterally attacking that protective order and saying, hey, that protective order was improper. It left us with no choice. It was an improper threat. It forced us to give up the yacht proceeds. So for that reason, the district court certainly did not err in ordering forfeiture of the yacht proceeds. To turn to the Enron Nigeria issues, I will let my co-counsel for the Republic of Nigeria address sovereign immunity. I recognize, as Judge Duncan said, that that could be used as a threshold issue. But even if Enron Nigeria got over that threshold issue, we believe from the United States perspective, there still are insuperable bars to Enron Nigeria's requested turnover order. At a big picture, they are trying to step into a civil forfeiture case to settle an unsecured judgment debt that is admittedly unrelated to any of the defendant assets in the case. And this is not a proper use of civil forfeiture proceedings. Certainly, the district court did not abuse its discretion in denying this requested relief. Indeed, allowing a general judgment creditor to hijack a debtor's claim years into a civil forfeiture proceeding would frustrate the rules governing civil forfeiture proceedings, which require that each claimant have its own interest in the asset and require them to all appear at the outset of the case. Under Enron Nigeria's view, there would be no certainty at any point in the case as to who the claimants even are in a civil forfeiture case, because an unrelated creditor could barge into the case at any point, shove aside an existing claimant, and try and step in. We've never seen that ever happen before, and we believe that would do great violence to the civil forfeiture statute and rules that require all claimants to come in with their own interest at an early stage of the case. I understand that Enron was making a claim against Nigeria's claim, not directly against the vessel. Of course, we see that all the time in civil lawsuits where a judgment creditor would seize the asset, that being the claim that the plaintiff is pursuing in the case. Why couldn't they do that here? So, Your Honor, we are not aware, and Enron Nigeria has never cited any case in which a judgment creditor was able to turn over a claim in a civil forfeiture case. There's good reason for that, because, again, the civil forfeiture statutes proceed under the supplemental rules, which say that claimants need to appear at an early stage so we know who all the claimants are. It's almost a matter of supremacy clause, Your Honor. It would really violate the statutes if some unrelated debt creditor could use a state law turnover action to muscle its way into a case. But in my last minute, there are two other reasons why Enron Nigeria's gambit was properly rejected. First is that Nigeria's claim was withdrawn. Under Rule 41C, Nigeria did not need the consent of the parties or the consent of the court to withdraw its claim. As a third-party claimant, it had the right to unilaterally withdraw its claim as it did. So the only thing Enron Nigeria could have taken over was a dead, defunct claim, and that couldn't have been litigated against the U.S. government. Finally, simply as a practical matter, what Enron Nigeria sought to do was pretty extraordinary. It sought to ask the district court to appoint a receiver to forcibly litigate Nigeria's claim for the benefit of Enron Nigeria against Nigeria's consent. Nigeria, as a foreign sovereign who can control access to its territory, who can control access to its citizens, it seems wildly infeasible that Enron Nigeria could have effectively litigated this hijacked claim, got evidence from the federal public of Nigeria who had no intent to give it. So for that reason as well, the district court did not abuse its discretion in denying it. Thank you, counsel. Now for the Federal Republic of Nigeria, Ms. Lopez. Thank you, Your Honor. May it please the court. As you identified, Your Honor, the threshold issue is, in fact, whether this claim meets the Section 1610A of the Foreign Sovereign Amenities Act used for a commercial activity. Enron conceded in its appellate brief that when Nigeria first filed its verified claim, it was not used for commercial activity and therefore would have been immune at the time filed because at that time it was being – it was pursuing misappropriated public assets, and the case law shows that that is not commercial activity. What Enron has asked this court is to find that Nigeria suddenly started using that claim two years later in commercial activity or for commercial activity by jointly moving with the United States Government for an interlocutory sale of the yacht and then consulting or being consulted by the United States Government on certain aspects of that sale. As we identified in our brief, Enron is wrong for several reasons. First, any involvement that Nigeria had in the interlocutory sale was not commercial activity under the FSIA because Nigeria did not use its claim to participate in the marketplace for profit. It didn't participate in the marketplace at all, nor could it have. This was a judicial sale. The U.S. Government had custody of the yacht – bless your honor – and it was a government forfeiture proceeding. Second, any commercial aspects of the interlocutory sale were decidedly not done by Nigeria, as has been alluded to in this argument. The United States contracted a broker, and the United States entered into a purchase agreement with the ultimate purchaser. Thereafter, the assets or the proceeds vested in the United States Government for later use in conformance with the goals of the kleptocracy initiative. The case law is clear. We cited this in our brief that it is the actions of the foreign state that count under the FSIA and not the actions of others. I would add that the case law that Enron has emphasized on this Zoom argument is not on point. First of all, the Walter Fuller case is not a 1610A case construing the used-for terminology, and I think it's already been identified that that was much more direct because it was the foreign state entering into a contract for purchase of goods and services, which is not this case. So that case is not on point. And as has been alluded to by the United States, Nigeria's claim has been withdrawn. So even if there's nothing to turn over in any event. So with that, unless your honors have questions, I'll cede the rest of my time to everyone else on the call. We have no questions. Thank you, counsel. Thank you. Let's see. We have Mr. Almadani. You have five minutes for rebuttal. Thank you, Your Honor. I appreciate it. There's a lot to cover, actually. I would begin with the issue here is, is an equitable property interest sufficient for prudential standing? That's really the question. And I think that everyone can agree that shareholders do have at least an equitable interest. You look at the statutory definition, you look at various case law. There's a lot of case law that recognizes the 11 million dollar case has recognized it. Also, in terms of looking at the forfeiture statutes, we can see that the myriad of cases in different scenarios hold that prudential standing in the civil forfeiture context is actually very, very broad. You know, a possessory interest is okay. If you look at the 4 million dollar case, that's a 9th Circuit case, that states that bank depositors have standing to file civil forfeiture claims. You look at the one Lincoln Navigator case, also cited as USB Bearden, that's cited in the 11 million dollar case. It's an 8th Circuit case. It also states that a grandmother who paid for a car, just paid for it, didn't have title in it, wasn't possessing, just paid for the car, could file a claim. So it's a very, very broad grant. And what we have, what the government I think is trying to take advantage of, is this reflexive reaction that we have when we hear the word shareholder and standing. We're like, oh, of course, shareholder. No, no, you can't have standing. But that's because of the prudential limitations that have been placed in the standard civil context. And what we're really urging this court is to grapple with what the legislature intended in the civil forfeiture context. And I would point the court to read our discussion on page 25 of our opening brief and page 7 of the reply brief. Where Mr. Sohn indicated, is there anything in the legislative history that tells us the breadth of the standing from an innocent ownership standpoint? And yes, when the legislative history says the term owner should be broadly interpreted to include any person with a recognizable legal or equitable interest in the property. And that's because Congress recognizes the Supreme Court has that civil forfeiture has a lot of due process concerns. The government can simply file a complaint against the property, restrain it, and then pretty much everyone's at the government's mercy. So that's why there's such a broad grant. And I take exception to this issue that the door would be blown wide open. No, it wouldn't be. It can be very limited to the civil forfeiture context. And this in this on the shareholder standing issue, because civil forfeiture is a limited area of the law. And Congress has carved it out differently. And the criminal forfeiture statute is different from the civil forfeiture statute. Criminal forfeiture requires a conviction. It follows its in personam jurisdiction. It requires the filing of a third party claim. It requires a conviction beyond a reasonable doubt. All of those protections are built in in the criminal forfeiture statute that are not in the civil forfeiture statute. The other thing I would really point the court to your honors is the government's own positions in its motions below. And that's in the record at 864 to 868. You know, the government took the position that light ray should be ordered to pay all necessary crew fees. Light ray should be ordered to pay all other fees necessary to maintain the yacht. Light ray should be ordered to bring the yacht back in the proposed order. You don't see the government proposing an order where Earnshaw would do anything. It would be light ray. The government cited case law saying that an owner should be required to maintain these assets. This is the position that the government took that light ray was the owner. And when you look at the court's order, the court's orders ordering light ray not Earnshaw to maintain the yacht. So when the government says and on the one instance that light rays the owner should be ordered to do X, Y and Z. But then for purposes of standing, light ray has no interest. I think that's also a little disingenuous. And I I would say that that your honor, in terms of I've got 38 seconds left. In terms of the procedural issue, your honor, we were not in the case. If we would have filed a motion saying that we want to we want to litigate this issue of duress in the way that the government gained the system here. I was a civil forfeiture a USA. I when I looked at what had happened, it wasn't right. And I wanted to be able to make the record, but we weren't in the case. We couldn't have filed the motion. Light ray would have filed a motion. Government would have said you don't have you're not in the case. You were struck. Earnshaw or any other entity filed a motion. The government would have said the court hasn't decided that Earnshaw is in the case. We need to be in the case to take the discovery to file the motion. That's the problem here with respect to those. Thank you. Thank you for your argument, counsel. Mr. Barrett, you have five minutes for a bottle. Thank you, your honor. There are several issues to address. But the first thing I want to remind the court is of the substance of the joint motion for sale of the of the vessel. And in it, it indicates that the moving parties, which include Nigeria and the U.S. Government shall establish an open bidding process for the Galactica star as well. It indicated that the moving parties, which included Nigeria, had selected Fraser Yachts, a well-known qualified yacht sales agent as a as a broker. So when Nigeria initiated the verified claim, it had not agreed to or entered into any sort of an agreement, whether in a motion or otherwise, to sell the ship. And then later it chose to. And then by doing so, by becoming involved, by setting for the details of the process for selling the vessel, they engaged in a commercial activity. Now, these are just the activities of a third party. These are the activities of Nigeria that it put in print in a motion that was filed with the district court. Now, as to the issue of whether allowing a judgment creditor to intervene in a in room forfeiture proceeding, whether it will blow the process open. I will remind the court that this situation is very rare. Indeed, you have a foreign sovereign that has waived its immunity to an asset and the judgment credit has obtained a judgment. And it is a rare situation where a judgment credit in this situation would step into litigation in order to attach a lawsuit or a claim filed by a foreign sovereign in the United States. This is a highly unusual situation and not something that would mess up the process. But if you look at the rules on intervention in the federal rules of civil procedure, it permits intervention of a party in the posture of Iran, Nigeria powerholdings. And nothing in the supplemental rules indicate that a judgment creditor can't seek to attach the interest of a of a of a judgment debtor. It doesn't disrupt the process. You're simply stepping into the shoes. You're not filing a direct claim against the the asset. You're merely trying to step into the shoes of the judgment creditor or judgment debtor. Back to the issue of 1610 a. And I can't tell how much time I have left. Two minutes and 17 seconds.  OK. The discussion as to Nigeria's withdrawal of its claim, as I mentioned, the the motion in which the mention of withdrawal was made does not mention that the the claim was withdrawn with with prejudice, which means that the claim is theoretically still in existence and could theoretically be turned over. And we think it was the error that the court did not turn over the complaint. But given the posture of the case in which the United States and Nigeria filed almost all of its pleadings as to the Galactica under seal, the Iran, Nigeria powerholdings was not in a position to know exactly what was going on with regard to the ship and the the filing of the motion on February 24th. Up until that time, the posture of Nigeria was we're entitled to the proceeds of the sale of this boat. We have participated in the sale. And then suddenly they withdraw the claim without providing any notice ahead of time to our client without seeking a joint dismissal. And we think rules of equity require that to have happened, given the filings that had already been filed in the case. It does not matter whether the commercial activity is whether it's profitable or not, is not the sole determination. The issue is whether it's a activity that a private party can engage in a private party, just like the other customers of Fraser Yachts also set up, manage, direct auctions of yachts. Because this is a typical transaction that's engaged in private parties. This is a commercial activity that a asset, which is a legal claim, recognizable into Texas law and under federal law that was used in the context of a commercial activity. My client asked for the court's help in collecting this judgment. Thank you. Counsel, thank you for a very learned presentation on all sides in this complicated case. We will. The case is submitted and we thank you for your time. Thank you, Your Honors.